RUDDICK CORPORATION

v.

The UNITED STATES

No. 477–77.

United States Court of Claims.

Feb. 25, 1981.

James P. Parker, Washington, D. C., attorney of record, for plaintiff. William W. Goodrich, Jr., and Arent, Fox, Kintner, Plotkin, & Kahn, Washington, D. C., of counsel.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Fergu-

son, Washington, D. C., for defendant. Theodore D. Peyser and Marc Levey, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION TO STRIKE, AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

At bottom this case presents a problem in the application of Section 482 of the Internal Revenue Code, 26 U.S.C. 482 (1954) (amended 1976), giving the Treasury Department certain discretion to allocate income between related corporations, but first we must decide whether Section 482 can be and has been invoked in this court.

## I. Facts

On the cross-motions for summary judgment now before us the following are the facts on which both parties now agree:[1]

Taxpayer Ruddick Corporation (Ruddick) is the parent (through a corporate reorganization) of R.S. Dickson and Company (RSD), a regional brokerage firm and dealer in the securities market. During 1968 RSD had a wholly-owned subsidiary, Ruddco, Inc. (Ruddco), which for a number of years had owned, as an investment, 52,638 shares of stock in American Credit Corporation (ACC), a company listed in the New York Stock Exchange. RSD caused Ruddco on October 25, 1968, to distribute to RSD as a dividend Ruddco's 52,638 shares of ACC stock. Three days later, on October 28, 1968, there occurred the corporate reorganization that created plaintiff Ruddick and made RSD a wholly owned subsidiary of Ruddick.[2] In December 1968 and January 1969 Ruddick directed the sale (to outsiders) by RSD of the ACC shares with a considerable gain.

At the time the ACC stock was distributed to RSD, Ruddco was a profitable company, taxable in 1968 and 1969 on any gain realized, but RSD had a large net operating loss carryforward (expiring due to the reorganization in 1970) that could be applied against a gain such as that from the later sale of the ACC stock. In fact taxpayer (and RSD) applied the gain from the sale of the ACC stock to this net operating loss.[3] It is also admitted for the present that RSD needed, for purposes of the Securities and Exchange Commission and the Midwest Stock Exchange, certain net capital, a need which would be satisfied by the ACC stock.[4]

The Internal Revenue Service treated the gain from the sale by RSD (to outsiders) of the ACC stock as part of Ruddco's income rather than of Ruddick's (as parent and successor for these purposes of RSD). A deficiency in Ruddco's income taxes for the fiscal year ending September 28, 1969 was accordingly determined. This was paid, a refund claim filed and disallowed, and this refund suit filed.[5]

1. In addition defendant considers that other significant facts are or may be present, but it expressly declares that those additional facts are not now sufficiently undisputed to be before us and accordingly should not be taken into account in passing on the efforts to have the case decided definitively at this time. For its part, plaintiff also asserts other factual positions that the Government emphatically does not accept. In Part IV, *infra*, we remand for consideration of the additional facts alleged by both sides.

2. Ruddco continued as a subsidiary of RSD.

3. The taxable period involved here is the fiscal year ending September 28, 1969.

4. This need arose because of the corporate reorganization in October 1968. RSD, as a member of the Midwest Stock Exchange, had previously met the net capital requirements by using shares that it owned of American & Efird Mills, Inc., but the corporate reorganization made both RSD and American & Efird Mills wholly-owned subsidiaries of plaintiff Ruddick. As a result, RSD no longer owned any stock of American & Efird Mills. It therefore needed some acceptable net capital to replace the shares of American & Efird Mills—the ACC stock would fulfill that need. Indirect ownership by RSD of the ACC stock through the former's ownership of Ruddco would not be enough for the Midwest Stock Exchange.

5. Two other issues stated in the petition are not before us.

## II. *Invocation of Section 482.*

■ The Government filed a motion for summary judgment that wholly relied on the power of the Commissioner of Internal Revenue under Section 482 of the Code to reallocate income between related corporations in order to prevent tax evasion (or avoidance) or clearly to reflect income. (At the time of the deficiency notice, the Service had not based its conclusion on Section 482 but on other interpretations of the transactions.) Taxpayer did not respond to the merits of the Section 482 position. Instead it moved to strike, asserting that the Internal Revenue Service had never applied Section 482 to the challenged tax and that the Department of Justice had no right of its own to invoke that provision in the absence of a Section 482 allocation by the Service.[6]

We do not detail the various charges and counter-charges because the upshot is that it has become indisputably plain that, before defendant's motion for summary judgment was filed, the relevant District Director (within the IRS) had actually invoked Section 482 "as an additional and/or alternative basis for attributing the gain on the sale of the American Credit Corporation [ACC] stock to Ruddco, Inc."[7] Notice of this invocation was duly given to taxpayer. It makes no difference if, as taxpayer surmises, invocation here of Section 482 was made at the suggestion or instigation of the Department of Justice. Nothing bars the Service from accepting advice from the Department (which, of course, cannot legally compel the Service to follow its advice).[8] Nor was it too late for the Treasury to invoke Section 482. The statute does not require such invocation before judicial proceedings; so long as the taxpayer, as here, has a fair and reasonable opportunity to challenge the Section 482 determination in the court suit, the Service can raise it and the Government can rely on it. *Commissioner v. Transport Mfg. & Equipment Co.,* 478 F.2d 731, 734–36 (8th Cir., 1973); *Nat'l Harrison Assoc. v. Commissioner,* 42 T.C. 601, 617 (1964). Plaintiff has had that reasonable notice; invocation of Section 482 occurred before defendant's motion for summary judgment and plaintiff has had full notice and opportunity to respond fully to the point.[9] By the same token it goes without saying that in this case the United States is not restricted to defending the refund suit only on the specific grounds raised in the original deficiency notice. *See Eli Lilly & Co. v. United States,* 178 Ct.Cl. 666, 676–677, 372 F.2d 990, 997 (1967) (*per curiam*); *E. I. Du Pont de Nemours & Co. v. United States,* 221 Ct.Cl. ——, ——, 608 F.2d 445, 454–55 (1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Commissioner v. Transport Mfg. & Equipment Co., supra.*

It follows that plaintiff's motion to strike must be denied. Defendant can seek to rely in this suit on Section 482 which has

---

6. The motion to strike also argued undue delay by the Government and supposed derelictions of counsel.

7. Section 482 gives the power of allocation to the Secretary of the Treasury or his delegate. It has been held, and we agree, that the provision cannot be utilized unless it is invoked within the Treasury. *Maxwell Hardware Co. v. Commissioner,* 343 F.2d 713, 721 (9th Cir. 1965); *United States Gypsum Co. v. United States,* 304 F.Supp. 627, 636 (N.D.Ill., 1969), *aff'd on this issue,* 452 F.2d 445, 450 (7th Cir., 1971). It is uncontested that in this case the District Director was a proper delegate of the Secretary under Section 482.

8. For this reason, we deny plaintiff's motion for an order compelling production of documents. That motion seeks to show, through production of internal memoranda within the Government, that the Service did not itself initiate the notion of reliance on Section 482 and that the Department of Justice first made that suggestion to the Service, and strongly so. Even if those facts should be proved, they would be irrelevant.

9. The lapse of time before the invocation of Section 482 is, by itself, insufficient to bar use of that provision. The critical point is that taxpayer has had and will have adequate chance to challenge the merits of the use of Section 482.

been timely invoked by the Internal Revenue Service.[10]

### III. *Defendant's Motion for Summary Judgment*

At the present stage, there is clear disagreement whether (i) a sale to strangers of the ACC stock was in contemplation when these shares were distributed in October 1968 by Ruddco to RSD and (ii) the concomitant October 1968 corporate reorganization was motivated, primarily or in lesser part, by tax motives tied to the then existence of RSD's operating loss. For that reason, defendant (as we understand its position on its summary judgment motion) accepts *arguendo* taxpayer's negative position on each of those issues. In like vein defendant also accepts *arguendo* at this point the business purpose stated for the transfer of the ACC shares from Ruddco to RSD—to enable the latter to continue to comply, after the reorganization, with the net capital requirements of the Midwest Stock Exchange and the S.E.C.

Accordingly, defendant does not now urge (in its summary judgment motion) that Section 482 can be properly used to prevent evasion or avoidance of taxes in this case; its contention is, rather, that the allocation made by the Service was necessary clearly to reflect the income of plaintiff, RSD, and Ruddco—a general objective likewise within the terms of Section 482[11]—regardless of the assumed absence of any tax taint, tax avoidance, or tax evasion purpose. In deciding that question we also have to postulate, as just pointed out, that there was a business purpose for the transfer of the ACC shares from Ruddco to RSD.

■ The first thing to note is that, where the clear-reflection-of-income branch of Section 482 is invoked, the presence of a business purpose or the absence of any plan to lessen taxes does not, in and of itself, exclude the operation of the provision. *Eli Lilly & Co. v. United States, supra,* 178 Ct.Cl. at 679–81, 372 F.2d at 998–99. The Treasury Regulations implementing Section 482 incorporate this theme when they provide (Treas.Reg. § 1.482–1(c)):

> In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. *The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [Emphasis added.]

■ Hypothesizing for this motion the absence of tax avoidance or tax evasion and the presence of a business reason for the transfer of the ACC stock, the Government nevertheless insists that there was a distortion of income which the Service could remedy under Section 482. The overall objective of that provision "is to enable the IRS to treat controlled taxpayers as if they were uncontrolled." *E. I. Du Pont de Nemours & Co. v. United States, supra,* 221 Ct.Cl. at ——, 608 F.2d at 450; *see* Treas. Reg. § 1.482–1(b) and 1(c) (quoted above). Defendant then says that if Ruddco were

---

10. Without further discussion, we also reject whatever other grounds may have been stated for plaintiff's motion to strike.

11. Section 482, prior to its amendment in 1976, provides as follows:

*Allocation of income and deductions among taxpayers.*

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

uncontrolled it would not have transferred the ACC shares "for nothing" (as it did) but would have received the stock's fair value from an arm's length purchaser and accordingly would have received the large amount of gain now attributed to it by the Service under Section 482. Conversely, the gain to RSD (and to plaintiff) realized from the later outside sale by RSD resulted entirely from appreciation of the stock while in the hands of Ruddco. The Government then adds that the Service is not barred from utilizing Section 482 by the fact that the transfer from Ruddco to RSD was a "tax-free" dividend transaction;[12] for this it relies on a number of court decisions and Treas.Reg. § 1.482–1(d)(5), providing: "Section 482 may, when necessary to prevent the avoidance of taxes or to clearly reflect income, be applied in circumstances described in sections of the Code (such as Section 351) providing for nonrecognition of gain or loss."

The difficulty with utilizing the court decisions defendant now cites for the Service's power under Section 482 to discount or disregard the nonrecognition Code provisions with which we are concerned is that those cases were quite different in important ways. In certain of them there plainly existed a significant element of tax avoidance or evasion—a factor which is, by careful hypothesis, absent from the Government's present motion. Definite account was taken of that element in *Northwestern Nat'l Bank of Minneapolis v. United States*, 556 F.2d 889, 891–92 (8th Cir. 1977); *National Securities Corp. v. Commissioner*, 137 F.2d 600, 602–03 (3rd Cir.), *cert. denied*, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943); *Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234, 236, 237–38 (2nd Cir.), *cert. de-*

nied, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459 (1935); *Southern Bancorporation v. Commissioner*, 67 T.C. 1022, 1025, 1027 (1977). In some of the other supposed precedents the taxpayer effected a sharp separation of the expenses or costs of producing the gain from the gain itself, with the Service successfully using Section 482 to tie the costs and the gain to the same taxpayer and same year so that there could be a true reflection of income. *Rooney v. United States*, 305 F.2d 681 (9th Cir. 1962); *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d 214 (2nd Cir.), *cert. denied*, 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952). In other decisions now proffered to us Section 482 was used to disallow an attempt by a particular taxpayer to obtain all the gain of a contract on the completed contract accounting basis, even though a related person or entity had done a substantial part of the work. *Standard Paving Co. v. Commissioner*, 190 F.2d 330 (10th Cir.), *cert. denied*, 342 U.S. 860, 72 S.Ct. 87, 96 L.Ed. 647 (1951); *Jud Plumbing & Heating, Inc. v. Commissioner*, 153 F.2d 681 (8th Cir. 1946); *Dillard-Waltermire, Inc. v. Campbell*, 255 F.2d 433 (5th Cir. 1958).[13]

We know of no decision truly kin to the present case (as we are required to view it on the defendant's stripped-down motion). Similarly, the Treasury Regulation quoted above cannot be read as allowing Section 482 to override all nonrecognition provisions, no matter the purpose and contemplation of the particular nonrecognition provision or the relationship of that provision to the particular transaction. The regulation is simply a general, over-all indication that the presence of a nonrecognition provision is not an automatic bar to use of Sec-

---

**12.** Under the Code, the circumstance that RSD and Ruddco were wholly related and the ACC stock was transferred upward as a dividend resulted in neither company's recognizing any gain on transfer of the stock, and RSD took over the shares at Ruddco's basis. Section 243 of the Code provides that RSD could deduct 100% of the ACC-shares dividend, received from its wholly owned subsidiary Ruddco. Section 301 provides that in these circumstances RSD took over as its basis for the ACC stock

the basis of that property in Ruddco's hands. Section 311 declares that (in the present situation) Ruddco, the distributing company, recognized no gain upon distribution of this property to the parent company.

**13.** A nonrecognition provision does not appear to have been relied on in *G. U. R. Co. v. Commissioner*, 117 F.2d 187 (7th Cir. 1941), and the Service's allocation there may well have rested on tax avoidance or evasion.

tion 482.[14] We cannot, therefore, decide this issue strictly on the basis of precedent or of the words of the Regulation but must consider the specific transaction in its connection with the specific nonrecognition provisions involved in this specific case.

Assuming as we now must that RSD's acquisition and later sale of the ACC shares were not tainted by any tax evasion or avoidance purpose and occurred solely because of true business aims,[15] we agree with a recent commentator's conclusion that "[t]he nonrecognition provisions reflect congressional judgment that gain or loss realized on certain transactions should not be recognized. The statutory framework that permits taxpayers to transfer property tax free, with a carry-over tax basis and tack-on holding period, implicitly accepts some income shifting and attendant income distortion. * * * [W]here no tax avoidance is present, the Commissioner should not be permitted to extend Section 482 into areas where the income distortion, if any, was contemplated by and flowed from the application of the nonrecognition provision in question."[16] In other words, Section 482 cannot be allowed, in the absence of a taint, to change or modify (on the ground of income distortion) a transaction which Congress has seen fit to authorize specifically in spite of the fact that that transaction may well embody some sort of income distortion. Having contemplated and authorized that possible distortion, Congress is not to be frustrated by use within the Service of the general provisions of Section 482.

On our present premises that is what defendant would like to do here. Sections 243 and 311 made it indisputable that neither RSD nor Ruddco was to incur gain on the mere transfer of the ACC stock by Ruddco, and Section 301 made it equally plain that RSD was to take over Ruddco's basis. The necessary conclusions (again in the absence of taint) are that (1) RSD was thereafter to hold the stock at carry-over basis as its own, and (2) RSD was thereafter to incur gain or loss with respect to that basis (if the shares were sold) even though that basis may have been established while the shares were earlier held by Ruddco.

Defendant admits that, before an outside sale of the stock, the Service could not use Section 482 to allocate the gain on' the transfer back to Ruddco and then tax that company on the transfer. That use of the section would undoubtedly fly in the very face of the nonrecognition provisions. But it is said that the distortion-of-income provisions of Section 482 become operative—even in the absence of any taint—when the stock is later sold to outsiders and the gain is then recognized. We think that that position, too, would contradict the postulates, implicit in Sections 243, 301, and 311, that RSD should thereafter treat the ACC stock as fully its own on the carry-over basis. Certainly if the stock had been sold several years after the transfer to RSD there could be no allocation of the gain back to Ruddco. In this case the sale happened to occur within two or three months and within the same taxable year. But there is nothing in these nonrecognition provisions or in Section 482 which authorizes a distinction—again we assume no taint—between outside sales within a few months or the same taxable year, and sales made years later. The same theoretical distortion of income could exist in both instances, and Congress made no distinction based on length of time or taxable years. The result, it seems to us, is that in neither case can Section 482 be automatically utilized if

14. Treas.Reg. § 1.482–1(d)(5), *supra*, provides that section 482 "may" be applied despite a nonrecognition provision, not that it "must" or "should" be so applied.

15. We expressly include in this general assumption (a) absence of any plan at the time of the transfer from Ruddco to RSD to sell or attempt to sell the ACC stock to outsiders after the transfer, and (b) the absence of any tax evasion and tax avoidance motive for the corporate reorganization of October 28, 1968.

16. Adess, *The Role of Section 482 in Nonrecognition Transactions—The Outer Edges of Its Application*, 57 Taxes 946, 966 (1979). Adess indicates some exceptions to the general rule he proposes, but, as discussed *infra*, we do not think these exceptions are pertinent here.

taint is absent.[17] The nonrecognition provisions involved here authorized the transferee corporation (RSD) to deal fully with the property and its carry-over basis as RSD's own, even though Ruddco, not RSD, originally earned the value which created the gain.[18]

The two sets of prior decisions in which the presence of taint was put aside but Section 482 allowed to be used do not conflict with our position. In *Central Cuba Sugar Co., supra*, a tax free reorganization in the midst of the year had the effect of permitting one related taxpayer to deduct the operation's expenses while another taxpayer reported the gain from the operation. This separation of expenses from gain violated the cardinal precepts that expenses and income should ordinarily be matched and that an enterprise's profitable year should not be allowed to become unprofitable through such a bifurcation. Unlike the Code provisions involved here, we see nothing in the nonrecognition provisions in that case that contemplated or authorized such outright distortion or violation of the basic precepts.[19] Similarly for the completed-contract cases, *supra*, that we have also called different; the tax-free reorganization provisions at stake there did not contemplate or authorize the successor taxpayer to report all the profits of the contracts where the dissolved or former company had actually done a good part of the work, earned a good share of the compensation, and in some instances had received a substantial portion of the pay. Both of these sets of decisions exemplify the need—taint apart—to look carefully at the particular

nonrecognition provision in the context of the specific transaction so as to see whether Congress authorized the particular unintended distortion.

We are likewise unimpressed—once more, taint aside—by plaintiff's use of the net operating loss to offset the gain from the outside sale of the ACC stock. After the reorganization Ruddco could not do that because Ruddco was no longer able to use the pre-reorganization loss to offset post-reorganization gain (*see* the "Separate Return Limitation Year" ("SRLY") regulation, Treas.Reg. § 1.1502–21(c)), while prior to the reorganization Ruddco and RSD filed consolidated returns and any outside sale at that time of the ACC stock by Ruddco or RSD giving gain could be offset against the operating loss (which was RSD's).[20]

The Government tells us that this fortuity due to the reorganization has to be accepted by plaintiff (and RSD) because they chose that form of business and "must accept the tax consequences of [their] choice, whether contemplated or not * * *." *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). As to that exact point we naturally agree, but it does not follow that the Service can properly find a distortion of income under Section 482 in these circumstances simply because RSD (after the recognition) used its existing loss to offset the gain from the sale of the ACC shares. Both before and after the reorganization, RSD and Ruddco (its wholly owned subsidiary) constituted one joint economic unit with a joint income. Though

---

**17.** This is not to say that a quick sale cannot be one indication of the presence of the taint of a tax avoidance or tax evasion objective. We repeat, once again, that throughout this Part III we are assuming the absence of any such taint.

**18.** We set apart the possibility that the Treasury could adopt a binding regulation—comparable in its precision to the regulation involved in *E. I. Du Pont de Nemours & Co., supra* —expressly limiting the Government's present position under Section 482 to the same taxable year. There is no such regulation and we have to decide this case in the absence of one.

**19.** The same is true of *Rooney, supra*.

**20.** Moreover, if it were not for the reorganization RSD would have been able to use its net operating loss for two years, including fiscal 1971 (in which it had other operating income capable of absorbing the loss). However, the Treasury Regulations made RSD have a short taxable period after the reorganization, reducing the period to which its loss could be carried by one year. Plaintiff maintains that its officers did not realize that the period for use of the net operating loss would be shortened by the reorganization. (We do not, of course, decide that factual issue at this time.)

the regulations did not allow Ruddco (after the reorganization) to utilize the operating loss, that technical requirement should not be equated here (on our present assumptions) to a true distortion of income under Section 482. The important points (as we have said) are that the particular nonrecognition provisions require that, upon receipt of the ACC stock, RSD should be treated fully as the stock's owner (with Ruddco's basis), and also that Ruddco should realize no gain. Under those provisions there was no unpermitted distortion of RSD's income after the outside sale. For the same reason, there was likewise no unpermitted distortion of Ruddco's income that was remediable under Section 482. If any technical distortion of income existed, that was authorized and contemplated by the nonrecognition sections. *Cf. Foglesong v. Commissioner*, 621 F.2d 865 (7th Cir. 1980). In economic terms there was no distortion at all in view of the continuing close relationship between RSD and Ruddco. It should be kept in mind that the prime objective of Section 482 is to enable the Service to ascertain "the true income picture" and the "income which accrued during the fiscal year for the enterprise as a whole." *Cf. Central Cuba Sugar Co. v. United States, supra*, 198 F.2d at 215, 216. To apply Section 482 on the present assumptions would be to elevate a purely technical "distortion" permitted by Congress over the economic reality that there was no distortion.

Our conclusion is that the Government's motion for summary judgment cannot be granted on the factual postulates on which it is presented. On that basis there was no distortion of income or failure clearly to reflect income within Section 482.[21]

IV. *Plaintiff's Cross-Motion for Summary Judgment*

■ With leave of the court, taxpayer also moved for summary judgment (after the oral argument). That presentation urges at some length the plaintiff's version of the circumstances, leading in taxpayer's eyes to the conclusion that there was absolutely no taint, no tax avoidance or evasion (plus the presence of solid business purpose) in each and all of the relevant steps and transactions—from the transfer upward (in October 1968) to RSD of the ACC shares through the outside sale of that stock in December 1968 and January 1969. Defendant strongly opposes these factual contentions (though not with as extensive material as taxpayer) and urges that if the Government's motion is denied (as we have done in Part III, *supra*) the remainder of the case should be remanded for trial.[22]

We are unwilling to decide the sensitive and complex issue of taint (including tax avoidance and evasion) in this substantial tax case on the affidavits and depositions which have been submitted to us. The Government has raised enough doubt to call for a trial on those factual questions and for an initial determination by the trial judge (or, to the extent the parties agree, other determination of the facts). A full-scale inquiry into the facts is warranted. *See, e. g., Strick Corp. v. United States*, 223 Ct.Cl. ——, 625 F.2d 1001 (1980); *Foglesong v. Commissioner, supra*, 621 F.2d at 872–73.

In sending the case back to the Trial Division, we intimate no opinion whatever on the factual issues, and leave those problems wholly to the trial judge. Specifically, we do not decide (or have any view) whether either the plaintiff's or the defendant's view of the facts has support in the materials and circumstances presented to us. The

---

21. Defendant's motion for summary judgment is restricted to the role of Section 482 on the strict assumptions we have stated. We do not understand that defendant has waived or abandoned any other defense to the claim which it may have, including (a) the original IRS position that the outside sale was tainted by tax avoidance or evasion and, even without Section 482, could be restructured; (b) Section 482 can be invoked because of the presence of taint, tax

avoidance, or tax evasion; and (c) *Dynamics Corp. of America v. United States*, 196 Ct.Cl. 282, 449 F.2d 402 (1971), is inapplicable on the true facts of this case and/or under Section 482.

22. Defendant has not moved for summary judgment on its version of the disputed facts. *See* Part III, *supra*, especially note 21.

matter is left wholly open for presentation to and consideration by the trial judge.

### V. *Conclusion*

The result is that plaintiff's motion to strike defendant's motion for summary judgment is denied,[23] defendant's motion for summary judgment is denied, plaintiff's cross-motion for summary judgment is denied without prejudice, and the case is remanded to the Trial Division for ventilation and determination of the facts. The only substantive holding we make is that, on the limited factual assumptions on which it is proffered *arguendo*, the Government's motion for summary judgment under Section 482 cannot be granted. Otherwise the case remains wholly open for further proceedings.

*So ordered.*

KASHIWA, Judge, concurring in part and dissenting in part:

I concur in part II of the majority opinion; for the reasons discussed therein I feel section 482 was properly invoked and plaintiff's motion to strike was properly denied.

I dissent, however, from the majority's denial of defendant's motion for summary judgment.

The opinion issued by the majority judicially amends section 482 to require a finding of a tainted transaction (*i. e.*, motives of tax avoidance or evasion) when dealing with sections 311 and 301 (with the necessary implication that this is the result for all the nonrecognition provisions found in the Code).

Such a result is inconsistent with the plain language of section 482 which states in the disjunctive that an allocation may be ordered by the Commissioner if he determines it is necessary "in order to prevent evasion of taxes *or* clearly to reflect the income." (Emphasis supplied.) The statute plainly provides *alternative* bases for applying section 482. Also, Treas.Reg. § 1.482–1(c) provides that the Commissioner's authority to determine true taxable income extends to income distortion resulting from inadvertence. As it was stated in B. Bittker, J. Eustice, *Federal Income Taxation of Corporations and Shareholders* (4th ed.) (Bittker & Eustice), p. 15–24: "it must be emphasized that tax-avoidance motives are not necessary for application of [section 482]."

An examination of the case law discloses that section 482 is a product of various themes: assignment of income principles, tax avoidance, general deduction theories, and clear reflection of income. While often these are applied in conjunction with one another, *e. g., Basic Inc. v. United States*, 212 Ct.Cl. 399, 549 F.2d 740 (1977), nowhere other than the majority's opinion is there any authority for their required conjunctive use.

Section 482 is a major instrument of the Code and the Commissioner to ensure fairness in transactions occurring between controlled entities. Treas.Reg. § 1.482–1(b)(1) defines the scope of section 482: "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." *See Young & Rubicam, Inc. v. United States*, 187 Ct.Cl. 635, 654, 410 F.2d 1233, 1244 (1969); H.R.Rep.No.2, 70th Cong., 1st Sess. 16, *reprinted in* 1939–1 C.B. (Vol. 18A) 384, 395; S.Rep.No.960, 70th Cong., 1st Sess. 24, *reprinted in* J. Seidman, *Seidman's Legislative History of Federal Income Tax Laws 1938–1861*, p. 522.

The majority opinion attempts to locate the justification for this new requirement in the tension existing between the policies of the nonrecognition provisions and the policies of section 482. Starting from the premise that the nonrecognition provisions contemplate and authorize distortion of income, it is held that where this "contemplated and authorized" distortion is present the only time section 482 may be used is when the transaction creating the distortion is tainted.

---

**23.** *See, also,* n.8, *supra*.

In applying their rule to the instant facts, the majority vacates the Commissioner's allocation. They find the escape from reporting any income on the sale of the appreciated stock transferred by a dividend in kind (which escape was provided by RSD's section 172 net operating loss (NOL)) was a distortion which was "contemplated and authorized by Congress."

Two circuit courts have, however, directly faced the issue of a conflict between section 482 and a nonrecognition provision.[1] Both circuits held that in such a conflict the specific results allowed from a strict adherence to the Code provision fall to the application of section 482, provided such allocation is not an abuse of discretion by the Commissioner.[2] *National Securities Corp. v. Commissioner, supra* note 2; *Rooney v. United States*, 305 F.2d 681, 686 (9th Cir. 1962). Thus, the majority's analysis is not only in conflict with the statute and Regulations but also with two circuit court analyses.

The majority also errs in a more fundamental manner by its misapprehension of the distortion actually "contemplated and authorized by Congress." The essence of a nonrecognition provision is the *deferral* of gain. "Nonrecognition is intended to be merely a postponement of the inclusion of the gain * * * until a disposition occurs which does not qualify for nonrecognition status. *It is not intended to produce forgiveness of the tax.*" (Emphasis supplied.) S. Surrey, W. Warren, P. McDaniel, H. Ault, *Federal Income Taxation* (1972 ed.) Vol I, p. 870.

In the instant case we are specifically concerned with section 311(a)(2) (no gain to Ruddco on the distribution) and section 301(d)(2) (B) (carryover basis to RSD in the ACC stock). Thus, while section 311(a)(2) does indeed prevent, on its face, Ruddco from recognizing gain on our facts,[3] section 301(d)(2)(B) concomitantly preserves that gain to be recognized at the first realizable event.[4] This preservation of gain effectuated by section 301(d)(2)(B) is therefore consistent with the rule that in a nonrecognition transaction gain is only deferred. Hence, the distortion actually authorized by section 311(a)(2) and 301(d)(2)(B) is a deferral of recognition of gain and the allowance of the distributee (RSD) to report such gain. This distortion is to end with RSD.

1. So have the Regulations. Treas.Reg. § 1.482-1(d)(5) provides:

    Section 482 may, when necessary to prevent the avoidance of taxes *or to clearly reflect income*, be applied in circumstances described in sections of the Code (such as section 351) providing for nonrecognition of gain or loss. See, for example, *National Securities Corporation v. Commissioner of Internal Revenue*, 137 F.2d 600 (3d Cir. 1943, cert. denied, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943). [Emphasis supplied.]

2. *National Securities Corp. v. Commissioner*, 137 F.2d 600, 602 (3d Cir.), cert. denied, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943), provides:

    * * * Section 45 [now section 482] is directed to the correction of particular situations in which the strict application of the other provisions of the act will result in a distortion of the income of affiliated organizations. In every case in which the section is applied its application will necessarily result in an apparent conflict with the literal requirements of some other provision of the act. If this were not so Section 45 would be wholly superfluous. We accordingly conclude that the application of Section 45 may not be denied because it appears to run afoul of the literal provisions of Sections 112(b)(5) and 113(a)(8) [now sections 351 and 362] if the Commissioner's action in allocating under the provisions of Section 45 the loss involved in this case was a proper exercise of the discretion conferred upon him by the section.

    By Section 45 Congress has conferred authority upon the Commissioner to allocate deductions "if he determines" that such allocation "is necessary". This is a broad discretion, limited only in that the necessity must arise "in order to prevent evasion of taxes or clearly to reflect the income." G. U. R. Co. v. Commissioner, 7 Cir., 1941, 117 F.2d 187. It should also be stressed that this analysis was specifically approved by Treas.Reg. § 1.482–1(d)(5). *See* note 1, *supra*.

3. *But compare* Treas.Reg. § 1.311–1(e)(1); S.Rep.No. 1622, 83d Cong., 2d Sess. 231 (attribution of income in situations similar to *Commissioner v. First State Bank of Stratford*, 168 F.2d 1004 (5th Cir.), cert. denied, 335 U.S. 867, 69 S.Ct. 137, 93 L.Ed. 412 (1948)).

4. An example illustrating this principle is found in Bittker & Eustice at p. 7–64.

Under our facts, once another Code section impacts on the transaction then section 482 is applicable.

The majority finds that RSD's escape from reporting any gain by virtue of the NOL was both contemplated and authorized by Congress. No reason, however, is given for the majority's disregard of the normal rules of nonrecognition transactions or, specifically, those relating to a dividend in kind.

I feel it is improper to hold that the intervention of the NOL was contemplated *and* authorized by Congress. To do so totally ignores the general and well-respected policing function given to section 482 by Congress. To be sure, Congress was aware that subsequent events could potentially cause a total escape from all tax after a nonrecognition transaction. This awareness, however, was precisely the reason for the enactment of section 482: Congress intended section 482 to prevent income distortion resulting from a strict application of specific Code provisions by controlled entities. *See* note 2, *supra*. Thus, the majority's analysis resting on a selected portion of the general concept of nonrecognition provisions is disingenuous.

Under section 482 the Commissioner is to evaluate the income picture as if the entities were uncontrolled and determine their true taxable income.[5] Treas.Reg. § 1.482–1(b). True taxable income is to be determined by the taxable income which would have resulted if the controlled taxpayer had dealt with the other controlled entity at arm's length. Treas.Reg. § 1.482–1(a)(6). The Commissioner is not limited to "fraudulent, colorable, or sham transaction[s]." Treas.Reg. § 1.482–1(c). Finally, in contrast to the consolidated return provisions, each entity is to be treated as a distinct and separate unit. *See* Bittker & Eustice at p. 15–23.

Therefore, under the standard of review this court and others have established, *see* note 5, *supra*, the proper test for determining whether the instant transaction clearly reflected the income of Ruddco is the following: Was it arbitrary for the Commissioner to determine that if Ruddco was not controlled by RSD, it would not have made the dividend of substantially appreciated stock? That is, is it arbitrary to find Ruddco would have demanded compensation before it relinquished a gain of $1,155,567?

*I find no arbitrariness in such a determination.* It is reasonable to assume Ruddco would have demanded compensation before divesting itself of the appreciated stock and thus Ruddco would have recognized the approximate $1,155,567 in taxable gain.[6] The total escape of this tax by any of the controlled entities is a material distortion of income and here, taint aside, the Commissioner can allocate the gain to Ruddco.

Additionally, I do not find it axiomatic, as does the majority, that if a distributee holds onto the stock for several years there can be no allocation under section 482. It is impossible to posit such an axiom because an allocation under section 482 depends upon the facts and circumstances of each transaction. Certainly the longer a stock is held the more arbitrary an allocation back to the distributing corporation appears. But, again, we must inquire: Is the allocation arbitrary?

The majority's analysis of the instant case should be through the structure established by the statute as written and the Regulations and under the review procedure this court has followed in the past. We should not preempt the function of Con-

---

5. This court and others have long held the Commissioner to have "broad discretion in reallocating income." *E. I. du Pont de Nemours & Co. v. United States*, 221 Ct.Cl. ——, ——, 608 F.2d 445, 455 (1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). *See, e. g., Eli Lilly & Co. v. United States*, 178 Ct.Cl. 666, 676–677, 372 F.2d 990, 997 (1967); *National Securities Corp. v. Commissioner, su-* *pra* note 2; *Edwards v. Commissioner*, 67 T.C. 224, 230 (1976).

6. The issue of whether section 482 may properly test a dividend situation involving a wholly owned subsidiary has already been (properly) answered in the affirmative. *Northwestern National Bank of Minneapolis v. United States*, 556 F.2d 889, 891–892 (8th Cir. 1977).

gress and amend the statute because of problems perceived and voiced by the Bar but unremedied by Congress.