**GENERAL ELECTRIC COMPANY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 395–78.

United States Claims Court.

Aug. 16, 1983.

M. Bernard Aidinoff, New York City, with whom were James T. McCarthy, Sabino Rodriguez, III, Mark C. Rosenblum and Janet M. Sydlaske, New York City, for plaintiff.

George L. Squires, Washington, D.C., with whom were Asst. Atty. Gen. Glenn Archer, Theodore D. Peyser, and Donald H. Olson, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

Plaintiff General Electric challenges the Commissioner's reallocation of losses suffered on the sale of certain assets. GE had acquired these assets through the tax free liquidation of a subsidiary. GE claimed the losses and the Commissioner reallocated them to the subsidiary. The parties have stipulated the facts and cross-moved for judgment.

## FACTS

Taxpayer is a large manufacturer of electrical products. In the late 1950's it established Caribe General Electric, Inc., the first of several wholly owned subsidiaries that were to perform manufacturing activities in the Commonwealth of Puerto Rico. GE structured these subsidiaries to take advantage of Internal Revenue Code section 931[1] which exempted them from United States

---

1. Unless otherwise indicated, citations are to the version of the Internal Revenue Code in effect at the time of the relevant transaction.

income taxation. In addition, under the Puerto Rican Industrial Incentives Act, the subsidiaries were exempt from Puerto Rican income taxes on most of their income for periods up to 15 years.

To take advantage of section 931 as it was then worded, Caribe and the other Puerto Rican subsidiaries had to derive at least 80% of their gross income from sources within a United States possession (such as Puerto Rico) and 50% or more of their gross income from the active conduct of a trade or business within such a possession. The code discouraged 931 subsidiaries from paying dividends by penalizing their distribution.[2] Caribe and the other subsidiaries therefore accumulated their earnings.[3] Some of the accumulated funds were invested in Puerto Rican real estate mortgage notes guaranteed by the Federal Housing Administration. The notes were particularly suitable investments for the 931 subsidiaries because they were secure, their income was exempt from Puerto Rican income tax and they enabled the subsidiaries to meet the requirement that 80% of their income derive from a U.S. possession.

GE had always intended that Caribe and the other 931 subsidiaries would remain in existence only as long as they retained exemptions from Puerto Rican income taxes. These tax benefits expired for Caribe in 1966 and GE proceeded to plan Caribe's liquidation in a manner that would minimize the overall tax liability of parent and subsidiary. After considering various alternatives, GE decided to merge Caribe into itself in a tax free liquidation under section 332 of the code. GE would thereby recognize no gain or loss on the transaction and

would succeed to Caribe's basis in all the subsidiary's assets. 26 U.S.C. § 336(b)(1).

General Electric planned to retain Caribe's manufacturing-related assets and to continue its operations as a branch, but it deemed the FHA mortgage notes to be distinctly unattractive investments. However, some of GE's other Puerto Rican subsidiaries needed FHA mortgage notes for their investment portfolios. Since the market for such notes was too limited to assure the remaining 931 subsidiaries a dependable source of supply, GE planned to make Caribe's FHA notes available to the other subsidiaries.

GE considered having Caribe sell the notes directly to the other subsidiaries. It rejected this option, however, when it became clear that the notes had decreased in value and that their sale would generate a significant capital loss. This loss would be of no use to Caribe but could provide a substantial tax benefit to GE as an offset against otherwise taxable capital gains. GE therefore directed that Caribe include the FHA notes in its liquidating distribution. GE also directed its other 931 subsidiaries to accumulate cash so that they could purchase Caribe's notes from GE after the liquidation.

Caribe was liquidated effective January 1, 1968. Later that year, GE sold the FHA notes to its remaining Puerto Rican subsidiaries at their current fair market value. Those sales yielded some $2.4 million less than Caribe had paid for the notes[4] and GE declared that amount as a long-term capital loss on its 1968 tax return.[5] On audit of that return, the Internal Revenue Service reallocated the loss to Caribe.

---

**2.** Dividends received by a parent from a 931 subsidiary were not eligible for the intercorporate dividends-received deduction available to domestic corporations. *See* Staff of the Joint Comm. on Taxation, 94th Cong., 2d Sess., Joint Committee Explanation of Tax Reform Act of 1976, at 272 (Comm. Print 1976), 1976–3 (vol. 2) C.B. 1, 284 [hereinafter J.Comm.Rep.].

**3.** This was a common—indeed an expected—method of operating a 931 subsidiary. *See generally* R. Holbrook, *A Study of the Characteristics, Behavior, and Implications of Posses-*

*sions Corporations in Puerto Rico* 16–17 (Oct. 1, 1977).

**4.** So far as the record discloses, this decline in market value occurred entirely while Caribe owned the notes. Plaintiff has not suggested otherwise.

**5.** In 1968, GE realized capital gains of some $1.13 million against which it applied an equivalent portion of the loss, carrying the remainder forward to 1969.

## DISCUSSION

### A.

Section 482 empowers the Commissioner to reallocate income, deductions, credits or allowances between two or more business organizations that are under common control, if he determines that such allocation is necessary "in order to prevent evasion of taxes or clearly to reflect ... income." Section 482 is a powerful tool and courts have given the Commissioner broad leeway in its application. *See, e.g., E.I. du Pont de Nemours & Co. v. United States,* 221 Ct. Cl. 333, 608 F.2d 445 (1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Northwestern National Bank v. United States,* 556 F.2d 889 (8th Cir.1977); *Rooney v. United States,* 305 F.2d 681 (9th Cir.1962); *Central Cuba Sugar Co. v. Commissioner,* 198 F.2d 214 (2d Cir.), *cert. denied,* 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952). Moreover, a taxpayer challenging the exercise of this authority has the burden of overcoming a presumption of correctness and of establishing that the Commissioner acted arbitrarily, capriciously and unreasonably. *E.I. du Pont,* 221 Ct.Cl. at 350–52, 608 F.2d 445; *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 654–55, 410 F.2d 1233 (1969).

There is, however, significant tension between the Commissioner's power to restructure transactions under section 482 and the tax code's nonrecognition provisions. In *Ruddick Corp. v. United States,* 226 Ct.Cl. 426, 434, 643 F.2d 747 (1981), the Court of Claims addressed this problem and concluded that "[w]here no tax avoidance is present, the Commissioner should not be permitted to extend Section 482 into areas where the income distortion, if any, was contemplated by and flowed from the application of the nonrecognition provision in question." The court reasoned that since Congress "contemplated and authorized that possible distortion, [it] is not to be frustrated by use within the Service of the general provisions of Section 482." *Id.*

*Ruddick* involved a dividend of appreciated stock [6] from a subsidiary to a parent corporation. This transfer was nontaxable and the parent acquired the subsidiary's basis in the stock. 26 U.S.C. §§ 243, 301, 311. The parent eventually sold the stock and offset the gain therefrom against an existing operating loss carry-forward. The case was presented on cross-motions for summary judgment. For the purpose of resolving the motions, the government made several significant concessions: that the parent's postdistribution sale of the stock to third parties had not been preplanned, that the transaction had a legitimate business purpose and that a subsequent reorganization of the parent was not motivated by tax avoidance.

Because of these concessions, the Court of Claims was able to address a theoretical case where, by hypothesis, no tax avoidance was present and the only income distortion was that specifically contemplated by the nonrecognition provisions in question. Under those circumstances, the court concluded that to permit the Commissioner to invoke section 482 would frustrate the intent of Congress in enacting the nonrecognition provisions.

While refusing to uphold the Commissioner's reallocation on the limited record before it, the court suggested that it would reach a different result if tax avoidance or evasion were shown, or if the income distortion which resulted fell outside the scope of congressional contemplation in enacting the applicable nonrecognition provision. *See* 226 Ct.Cl. at 432–33, 435–36, 643 F.2d 747 & cases cited therein.[7]

### B.

Here taxpayer took advantage of two separate tax relief provisions. First, it

---

**6.** The stock was in an unrelated company and represented a capital investment.

**7.** On remand, this court found that the assumptions on which the Court of Claims based its ruling were unsupported by the record presented at trial. The court, consequently, upheld the Commissioner's reallocation of the losses claimed by Ruddick. *Ruddick Corp. v. United States,* 3 Cl.Ct. 61 (Cl.Ct.1983) (WILLI, S.J.).

operated Caribe as a 931 subsidiary, taking in and accumulating earnings tax free as contemplated by that section. Then, it effected a tax free liquidation under section 332 to repatriate those earnings, together with certain capital losses which Caribe had suffered but not yet realized. In determining whether the Commissioner properly reallocated the losses to Caribe, the court must determine whether GE achieved a distortion not contemplated or intended by Congress when it enacted these provisions. The court need not find specific congressional disapproval in order to uphold the Commissioner; it suffices if the distortion is not one implicitly sanctioned by Congress as an integral aspect of a nonrecognition transaction or if the result achieved conflicts with the logic of applicable provisions of the tax code.[8]

Section 931 afforded companies generous benefits but, as it was then written, also imposed significant constraints on their operation. The net effect of these constraints was to force 931 subsidiaries to engage principally in the active conduct of a trade or business within a U.S. possession and to retain their earnings and invest them within a U.S. possession.[9] Congress also prohibited corporations benefiting from section 931 from filing consolidated returns with any affiliated corporations. J.Comm.Rep., *supra,* at 273, 1976–3 (vol. 2) C.B. at 285. While the genesis of this prohibition is not entirely clear,[10] it appears to reflect a congressional judgment that corporations entitled to tax free income should not gain a

separate tax benefit from their losses by offsetting such losses against the otherwise taxable earnings of their affiliates.

Congressional attitude toward 931 corporations is revealed by the legislative history of the 1976 amendments to section 931[11] which followed the Tax Court's decision in *Burke Concrete Accessories, Inc. v. Commissioner,* 56 T.C. 588 (1971). *Burke* held that section 1504 precluded corporations from filing consolidated returns only in those years when they derived benefits from section 931 (i.e., when they earned income exempted from taxation under section 931), but that they were free to file consolidated returns in other years (e.g., when they incurred only losses). The *Burke* court therefore allowed a domestic parent to offset taxable gains against the operating losses of its 931 subsidiary by including the subsidiary in a consolidated return.

Congress reacted strongly to the decision, registering its concern that corporations might manipulate the consolidated return provision thus interpreted to obtain unwarranted benefits:

> As a result [of *Burke*], corporations can in effect gain a double benefit. Not only is the possessions and other foreign source income of these corporations excluded from U.S. taxable income, but losses of possessions corporations can, by filing a consolidated return, reduce U.S. tax on the U.S. income of related corporations in the consolidated group.

1976–3 (vol. 3) C.B. 49, 315. Congress considered them "important . . . in keeping investment in the possessions competitive with investment in neighboring countries." *Id. See generally* Comment, *Consolidating the Loss Operations of Domestic Corporations Operating in United States Possessions,* 56 Va.L.Rev. 504, 507–08 (1970) [hereinafter *Loss Operations Comment*].

**8.** A commentator on whose analysis the *Ruddick* court relied expressed this idea as follows:

> In certain circumstances . . . a transaction falling squarely within a nonrecognition provision may create an unacceptable or unanticipated distortion in the parties' income. In such cases, Section 482 may be applicable. Adess, *The Role of Section 482 in Nonrecognition Transactions—The Outer Edges of its Application,* 57 Taxes 946, 948 (1979).

**9.** These provisions were intended "as an inducement to U.S. corporate investment . . . in Puerto Rico and the possessions." H.R.Rep. No. 658, 94th Cong., 1st Sess. 254 (1975), 1976–3 (vol. 2) C.B. 695, 946; S.Rep. No. 938, 94th Cong., 2d Sess. 277 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3150,

**10.** One commentator who exhaustively researched the subject found the relevant legislative history to be "singularly unenlightening." *Loss Operations Comment,* 56 Va.L.Rev. at 522 & n. 137.

**11.** Tax Reform Act of 1976, Pub.L. 94–455, § 1051, 90 Stat. 1520, 1643–47.

H.R.Rep. No. 658, *supra,* at 256, 1976–3 (vol. 2) C.B. at 948; S.Rep. No. 938, *supra,* at 279, 1976–3 (vol. 3) C.B. at 317, U.S.Code Cong. & Admin.News 1976, p. 3151.

The 1976 amendments corrected this problem by permitting possessions corporations to shift early or start-up losses to affiliated companies through a consolidated return, but prohibiting them from doing so in later years. Significantly, Congress directed that even such start-up losses be recaptured in later years when the subsidiaries earned tax free income. *See generally* H.R.Rep. No. 658, *supra,* at 256–58, 1976–3 (vol. 2) C.B. at 948–50; S.Rep. No. 938, *supra,* at 279–81, 1976–3 (vol. 3) C.B. at 317–19.

While the events here predate the 1976 amendments, this legislative history is instructive in documenting congressional attitude toward 931 corporations. Congress did not expect that 931 corporations would be able to obtain a double benefit by earning tax free income and at the same time siphoning losses to related taxable entities. The firm legislative response to *Burke* suggests that Congress intended 931 corporations to offset losses only against their own income and not to use those losses to reduce the tax burden of related entities.

In this case, no loss was actually realized by Caribe. Rather, assets which it owned had decreased in value. However, the accumulation of assets that would keep the company's earnings within a U.S. possession was part and parcel of the congressional scheme with respect to section 931. *See* p. 2 and nn. 2 & 3 *supra.* Income earned on these investments was tax free to Caribe. Given the strong congressional reaction against the diversion of operating losses to taxable related companies when the 931 subsidiaries have earned sheltered income, it is difficult to believe that Congress con-

sidered it appropriate so to shift losses suffered on investments. The logic of section 931 suggests that losses associated with the generation of tax free income by one entity should not be recognized by another.

Caribe earned no less than $34.6 million of tax free income during its existence. The earnings were accumulated so that at liquidation Caribe's balance sheet showed assets with a basis of $37 million, of which the FHA notes comprised almost $28 million. GE carefully considered the sale of the notes before the liquidation and instructed Caribe not to sell them to the other subsidiaries but to include them in the liquidating distribution so that GE could later consummate their sale.

GE was fully entitled to plan Caribe's liquidation so as to take advantage of the code's nonrecognition provisions. Under *Ruddick,* the Commissioner could not normally invoke section 482 to deprive a taxpayer of the benefits Congress intended it to enjoy by enacting sections 332 and 334(b)(1). However, where the taxpayer employs a nonrecognition provision to achieve an overall result that is abusive of another provision of the tax code, the Commissioner is not precluded from exercising his authority under section 482. Here, taxpayer juxtaposed two tax free transactions to achieve a result which runs contrary to the logic of section 931 and congressional expectations as to its proper operation. In exercising section 482's reallocation authority to place the loss with the party whose property generated it, the Commissioner acted both lawfully and reasonably.[12]

## CONCLUSION

Defendant's motion for judgment is granted; plaintiff's motion is denied. The

---

12. It is not without significance that the earliest predecessor of section 482, enacted as section 240(d) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 260, reflected congressional concerns about "the arbitrary shifting of profits among related businesses, particularly in the case of subsidiary corporations organized as foreign trade corporations." S.Rep. No. 275, 67th Cong., 1st Sess. 20 (1921). Foreign trade corporations in turn were defined by section 262 of the code (specifically referenced in section 240(d)), an early predecessor of section 931. This suggests that the Commissioner's power to reallocate income with respect to foreign trade corporation subsidiaries enjoys specific legislative sanction and therefore deserves an even greater than usual degree of deference.

clerk is directed to dismiss the petition with costs to the prevailing party.