**RUDDICK CORPORATION**

v.

**The UNITED STATES.**

**No. 477–77.**

United States Claims Court.

July 22, 1983.

James P. Parker, Washington, D.C., for plaintiff. William W. Goodrich, Jr., Washington, D.C., of counsel.

Donald H. Olson, Washington, D.C., with whom was Asst. Atty. Gen. Glen L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Jr., Washington, D.C., of counsel.

## OPINION

WILLI, Senior Judge:

On the eve of a carefully planned nontaxable reorganization, by which investment banker and securities dealer R.S. Dickson and Company (RSD) joined with textile manufacturer American & Efird Mills, Inc. (A & E) to form the plaintiff, RSD, having a large net operating loss carryover and a poor prognosis for generating sufficient post-reorganization operating income to timely utilize it, caused its wholly owned venture capital subsidiary, Ruddco, to declare a dividend of 52,638 shares of American Credit Corporation (ACC) common stock with unrealized appreciation approximating the amount of the unused loss carryover. This dividend action accorded with the prior suggestions of Haskins & Sells (H & S), retained by RSD to advise it on the tax aspects of the reorganization.

Shortly after the reorganization RSD sold the ACC stock, thereby realizing its appreciated value, and on its tax return absorbed the loss carryover with the resulting capital gain. This tax reporting treatment conformed with Internal Revenue Code Secs. 243, allowing full deductibility of the dividend received by the parent; 301, mandating the parent's assumption of the subsidiary's basis in the dividend shares; and 311, providing that the subsidiary is to recognize no gain on the dividend transfer of the appreciated shares.

On audit the Commissioner of Internal Revenue took the position that the dividend transaction was undertaken for tax, rather than business reasons and that, accordingly, the gain realized upon sale of the dividend

shares was taxable to Ruddco, not RSD. After assessment and payment of the resulting deficiency the present suit for refund was brought.

After some considerable preliminary skirmishing in the litigation, defendant moved for summary judgment, relying on the reallocation authority of Sec. 482 to clearly reflect the respective incomes of related entities to override the nonrecognition features of Secs. 243, 301 and 311. Plaintiff challenged the Government's right to first invoke Sec. 482 only after suit had been filed and otherwise cross-moved.

In an opinion of February 25, 1981 a panel of the United States Court of Claims unanimously held that Sec. 482 was properly invoked. Beyond that, however, a majority of the panel held that absent what it called "taint" in the conception and execution of the dividend and subsequent sale transactions the reallocation authority of Sec. 482 could not be permitted to override the nonrecognition treatment that Congress had provided. *Ruddick Corp. v. United States,* 226 Ct.Cl. 426, 643 F.2d 747. The majority repeatedly emphasized that the defendant assumed, for purposes of its motion, the absence of ulterior tax motivation in the total situation and also conceded the presence of a legitimate business purpose prompting the dividend action and the later sale of the dividend shares.

Explaining that it was "unwilling to decide the sensitive and complex issue of taint (including tax avoidance and evasion) in this substantial tax case on the affidavits and depositions which have been submitted to us,"[1] the majority denied both parties' summary judgment motions and remanded the cause for "ventilation and determination of the facts."[2] Pursuant to that mandate a trial was held and the emergent facts concerning the background, execution and aftermath of the reorganization and the related dividend action are detailed in the findings of fact accompanying this opinion.

---

1. 226 Ct.Cl. at 438, 643 F.2d at 754.

2. 226 Ct.Cl. at 439, 643 F.2d at 755.

Research suggests that the concept of taint, as applied to the interplay between Sec. 482 and the nonrecognition provisions here involved, is original with the panel majority. Although the majority omitted to define the concept that it introduced, it did identify two ingredients relevant to the circumstances presented here that amply suffice to dispose of this case. I refer to the following observation of the majority (226 Ct.Cl. at 434, 643 F.2d at 752):

> Assuming as we now must that RSD's acquisition and later sale of the ACC shares were not tainted by any tax evasion or avoidance purpose and occurred solely because of true business aims *
> * * *.

___

\* We expressly include in this general assumption (a) absence of any plan at the time of the transfer from Ruddco to RSD to sell or attempt to sell the ACC stock to outsiders after the transfer * * *.

Whatever else taint may embrace in the abstract, it is clear from the above that it exists here if (1) the dividend declaration was prompted by tax rather than true business aims, or (2) there existed at the time of the declaration any plan to later sell the dividend shares. I take these pronouncements, together with the holding validating the applicability of Sec. 482, as constituting the law of the case. As such, they govern the determinations to be made at this later stage of the litigation. *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 197–198, 200–201, 634 F.2d 557, 560, 561–562 (1980).

As a member of the Midwest Stock Exchange and a securities underwriter subject to the jurisdiction of the Securities and Exchange Commission, RSD was subject to liquidity requirements that obliged it to maintain net capital of not less than six and two-thirds percent of its aggregate indebtedness. Such capital must consist of readily marketable assets valued on a conservative basis requiring, for example, a 30-percent discount of the quoted value of stocks traded on the New York Stock Exchange and a 50-percent discount of the quoted value of stocks traded over-the-counter. Stocks not publicly traded receive a zero value for net capital purposes.

For many years prior to the reorganization RSD owned 110,004 shares of A & E common stock, an issue that was traded over-the-counter. At the time of the reorganization those shares had a market value of $1,705,062. Finding 20, *infra.* At that value they contributed so substantially to RSD's ability to meet its net capital obligations that without them it would have fallen far short of doing so.

The form of the reorganization that joined RSD and A & E to create the plaintiff was dictated by a major A & E secured creditor, the Equitable Life Assurance Society. Findings 15, 21, *infra.* The plan preferred and initially proposed by RSD and A & E was a simple merger, with the resulting entity, plaintiff, to function as an operating company. Equitable refused to approve that format, however, insisting that its collateral remain in the name of A & E. It was for that reason that a holding company approach was adopted whereby A & E and RSD became plaintiff's wholly owned subsidiaries with the shareholders of those two corporations receiving plaintiff's stock in exchange for their former holdings in A & E and RSD. As consummated, the reorganization was carried out in that manner with one exception, relating to the 110,004 A & E shares owned by RSD. Instead of RSD receiving plaintiff's stock in exchange for its A &·E shares, just as all other A & E shareholders did, it received nothing and thereby sustained a net capital contraction for regulatory purposes of $852,531 ($1,705,-062 discounted by 50 percent). Rather, it was the RSD shareholders who benefited by receiving additional shares of plaintiff's stock representing the $1,705,062 value of the 110,004 A & E shares that were owned not by them but by their corporation.[3]

For purposes of the summary judgment proceeding the defendant conceded that

___

3. It may be safely assumed that if, before the reorganization, RSD had distributed the 110,-004 A & E shares to its stockholders they would have received a dividend of $1,705,062 taxable to them as ordinary income to the extent of RSD's earnings and profits.

RSD's purpose in precipitating the upstream dividend of the ACC stock was the replenishment of its net capital after the depletion ostensibly caused by the reorganization that terminated the existence of A & E and, therefore, of its stock. The panel majority described the concession as follows (226 Ct.Cl. at 428, 643 F.2d at 748):

It is also admitted [by the defendant] for the present that RSD needed, for purposes of the Securities and Exchange Commission and the Midwest Stock Exchange, certain net capital, a need which would be satisfied by the ACC stock.*

___

* This need arose because of the corporate reorganization in October 1968. RSD, as a member of the Midwest Stock Exchange, had previously met the net capital requirements by using shares that it owned of American & Efird Mills, Inc., but the corporate reorganization made both RSD and American and Efird Mills wholly owned subsidiaries of plaintiff Ruddick. *As a result,* RSD no longer owned any stock of American & Efird Mills. It therefore needed some acceptable net capital to replace the shares of American & Efird Mills—the ACC stock would fulfill that need. (Emphasis added.) * * *

From the outset, plaintiff's stock traded over-the-counter, just as A & E's stock had. It was therefore fully as admissible for RSD's net capital purposes as the A & E shares had formerly been. Finding 22, *infra.*

RSD obviously lost the value represented by its A & E shares because its stockholders desired to divert that value to themselves (and to do so tax-free),[4] not because such loss followed as an automatic concomitant of the reorganization. Thus, RSD's need for the ACC shares only arose because the shareholders denied it the stock of plaintiff that was due it in exchange for surrender of its A & E shares.

The repair of a financial wound that is intentionally self-inflicted is not a business

___

4. Finding 18, *infra.*

5. H & S recommended the upstream dividend of the ACC stock as a protective measure should the reorganization not take the form of a straight merger that would make post-merger ordinary income from A & E operations available to absorb the loss carryover. Because of

purpose antithetical to garden variety tax maneuvering.

Accordingly, the upstream dividend of the ACC stock fails the first of the two tests of taint posited by the panel majority, *supra,* that of underlying business purpose.

Because the evidence adduced at trial unmistakably discloses the existence of a specific plan, articulated and recommended to RSD in August 1968 by its tax advisor, H & S, designating the unrealized appreciation in Ruddco's ACC stock as a fail-safe[5] means of utilizing RSD's loss carryover, the second earmark of taint identified by the panel majority is also present. Finding 19, *infra.* The upstream dividend recommended by H & S accomplished only the essential preliminary of getting the ACC shares into RSD's hands. Because of the nonrecognition provisions referenced earlier (Secs. 243 and 301), that action, without more, yielded RSD no taxable income to apply against its losses. Thus, implicit in the H & S dividend recommendation was RSD's sale or exchange of the ACC stock, once obtained, so that its unrealized appreciation would become recognized, Code Sec. 1001(c), and thereby available to utilize the carryover.

The influential effect of H & S's August 1968 recommendation to RSD for utilization of its loss carryover is most convincingly attested by the fact that it was implemented to the letter. It must, therefore, be said that at the time of the October 1968 upstream dividend there existed a plan calling for RSD's sale or other taxable disposition of the ACC shares.

Finally, plaintiff contends that in order to sustain a reallocation to Ruddco of the gain realized on RSD's sale of the ACC shares the court must turn its back on *Dynamics Corp. of America v. United States,* 196 Ct.Cl. 282, 449 F.2d 402 (1971).

___

Equitable's opposition, the reorganization did not take that route so the problem became one of at least insuring the existence of sufficient capital gain to utilize the carryover, albeit to a lesser tax advantage, before it expired by default.

That case, decided on a fully stipulated record, found a parent holding company with a large ($537,321) capital loss carryover causing its controlled (but unaffiliated) operating subsidiary that was without losses to declare an upstream dividend of a business property that had become surplus to the subsidiary's needs and had, in fact, been offered for sale at the parent's direction before the dividend action.[6] Within the same tax year as the dividend, but more than six months after it, the parent sold the property, realizing a capital gain of $332,134 that it absorbed with its loss carryover on its return for the taxable year. The Internal Revenue Service, without attempting to invoke Section 482, reallocated the gain to the subsidiary on the ground that it, not its parent, was the real seller of the property.

A trial commissioner disapproved the reallocation, doing so because he found that the dividend transfer was motivated primarily by business reasons. The reasoning for that result was as follows (196 Ct.Cl. at 299, 449 F.2d at 411):

> The decision to transfer this real estate back to the parent holding company may be inferred to have been motivated by both business and tax considerations. *Cf. Rothschild v. United States,* 407 F.2d 404, 186 Ct.Cl. 709 (1969). From a business point of view, there would appear to be some selling advantage inhering in ownership by a pure holding company, such as Dynamics, rather than by a purely manufacturing concern, such as Reeves. Dynamics could afford to devote more time and attention to the problem of selling real estate, or perhaps, if no satisfactory sale could be obtained, converting it entirely to rental property. From the tax standpoint, on the other hand, the overall corporate group stood to benefit from a sale by Dynamics rather than by Reeves. This is because, in 1958, Dynamics possibly had a capital loss carryover against which to apply any gain on the sale, whereas Reeves clearly had no such carryover. However, on the entire stipu-

lated record, it has been concluded that the business motivations for the transfer were primary and that the sale of 215 E. 91st Street was in substance what it was in form, namely, a sale by Dynamics, not by Reeves.

Notably, the sole business purpose justification perceived in *Dynamics* (the holding company-parent's ability to more effectively achieve the predetermined objective of sale) has been identified by the panel majority in this case as a manifestation of taint justifying a reallocation. 226 Ct.Cl. at 434, n. 15; 643 F.2d at 752, n. 15.

Concededly, the holding of *Dynamics,* if applied to the facts presented here, augers favorably for the plaintiff. While that holding might be equivocated on the ground that the Government apparently did not urge the applicability of Sec. 482 to support a reallocation, it is more appropriate to forthrightly acknowledge it as the unfortunate product of oversight that can result from a *per curiam* adoption of an uncontested opinion. As such, it lacks precedential force. *Torncello v. United States,* 231 Ct.Cl. ——, 681 F.2d 756, 768 (1982).

Because the dividend transaction was not undertaken for an acceptable business purpose and because there existed a prior plan for sale of the dividend shares, reallocation of the resulting gain to Ruddco was proper and plaintiff is therefore not entitled to recover.

All other issues in the case having been previously resolved, the petition (now complaint) will be dismissed.

## FINDINGS OF FACT

1. Plaintiff, a North Carolina corporation, is the product of a tax-free reorganization that occurred on October 28, 1968 under which, in return for certain of its shares, plaintiff acquired all of the outstanding stock of both R.S. Dickson and Company (hereinafter called Old RSD), an investment banking firm with a wholly owned venture capital subsidiary, Ruddco,

---

**6.** 196 Ct.Cl. at 289, 449 F.2d at 405.

and American & Efird Mills, Inc. (A & E), a textile manufacturer.

2. In terms of net worth, A & E, whose stock was traded over-the-counter and was held by approximately 1,500 shareholders, was roughly two and one-half times as large as Old RSD, whose stock was not traded on any public exchange and was held by some 300 shareholders.

3. Old RSD was founded in 1919 and initially operated primarily in the southeast as an underwriter and distributor of textile manufacturers' short-term commercial paper. It later became a municipal bond and securities underwriter, in the secondary market, for public utilities and municipalities in North Carolina, South Carolina and Georgia. In the 1930's Old RSD became a general corporate underwriter. In addition, it formed a wholly owned subsidiary, called Ruddco herein, to engage in the venture capital business.

In January 1950 Old RSD became a member of the Midwest Stock Exchange (MSE). It dropped the membership in 1964 but reinstated it in September 1965 and retained it until March 1, 1970. In addition, old RSD was a member of the National Association of Securities Dealers (NASD), the organizational overseer of the over-the-counter securities market.

To insure the financial responsibility of its members MSE enforces a rule of liquidity whereby a member must at all times maintain net capital equal to not less than 6⅔ percent of its aggregate indebtedness. Moreover, such capital must consist of readily marketable assets valued on a conservative basis. Thus, the quoted value of shares traded on the NYSE and over-the-counter is discounted 30 and 50 percent, respectively, for this purpose. In the same connection, actively traded bonds are discounted 12½ percent.

Apart from exchange membership requirements, a securities broker-investment banker such as Old RSD is subject to Securities and Exchange Commission (SEC) jurisdiction, and the SEC imposes liquidity requirements on all such operators.

The most stringent liquidity rules to which Old RSD was subject were those imposed by the MSE.

4. Throughout its existence Old RSD was controlled by members of the Dickson family and related interests. Mr. R. Stuart Dickson joined the firm in 1952. In 1968 and for some time theretofore he was its president and Board chairman.

5. In the early 1940's Old RSD purchased 100,004 shares of the common stock of A & E at a cost of $305,462. At the same time various members of the Dickson family and related interests also purchased A & E common stock. The aggregate of the latter purchases, together with the shares acquired by Old RSD, represented effective control of A & E.

6. In 1957 Mr. Alan T. Dickson, R. Stuart Dickson's younger brother, joined A & E. Alan Dickson had received a degree in textile engineering from North Carolina State University followed by an MBA from Harvard. He progressed rapidly through the ranks at A & E and was that company's president in 1968, at which time he was also a director of Old RSD.

7. Old RSD operated on a September 30 fiscal year basis for both book and tax purposes. It filed consolidated returns with its subsidiary, Ruddco.

8. In the mid-1950's some large textile manufacturers, including Burlington Mills and Dan River Mills, expressed interest in acquiring A & E. Some A & E shareholders favored a sale but the Dickson interests, fortified by the A & E holdings of Old RSD which they controlled, opposed and were able to prevail.

9. Another development in the mid-1950's was the onset of change in the securities distribution business. The era marked the increasing prominence, spurred by the self-promotion efforts of the New York Stock Exchange (NYSE), of the larger brokerage houses such as Merrill, Lynch, Paine, Webber, and Bache at the expense of the 5,000 local and regional brokers who were not members of the NYSE. At the time NYSE membership eligibility was limited to

the partnership form of business—this for reasons of financial responsibility.

10. In the late 1950's and early 1960's the NYSE, anxious to increase its membership thereby enhancing its credibility as the exchange that most accurately reflected security values, undertook an extensive study addressed to means and methods by which incorporated brokerage houses might be admitted to NYSE membership.

11. Old RSD, aware of the bleak future prospects of regional brokerage houses without NYSE membership and encouraged that the NYSE would alter its membership rules to admit corporations, undertook to expand its business so that it could qualify for NYSE membership when the partnership rule was relaxed. To that end it opened brokerage offices in New York, Chicago, Atlanta, Miami, Richmond and Tampa, increasing its complement of such offices to 18 in all. After these preparatory steps had been taken, however, two developments occurred that prevented attainment of the firm's ultimate objective—NYSE membership. First, a group of NYSE-member New York securities firms that specialized in bank stocks and strongly opposed an enlargement of membership sued the Exchange to compel retention of the partnership requirement. That action caused the Exchange to abandon its plans for relaxation of that requirement. Second, the Dickson interests in Old RSD found that they were unable to restructure the firm to meet the Exchange's partnership requirement. Specifically, a group of Old RSD's minority shareholders, feeling that they were disadvantageously "locked into" an investment for which there was no public market, used the occasion to further their desire to either acquire Old RSD's shares of A & E, or gain control of Old RSD itself. Either result would have ended the Dickson family's control of A & E. To accomplish the second of the two alternatives previously described, the minority placed a value on their Old RSD shares that the Dickson's were unwilling to meet so the restructuring effort was abandoned. With the expectation of NYSE membership extinguished and with the continuing decline in investor patronage of the over-the-counter market, Old RSD instituted certain cost-cutting measures. Specifically, in late 1963, it closed the branch offices that it had operated in Richmond, Raleigh, Greensboro, Columbia, Greenville and Jacksonville. These measures did not, however, return Old RSD to the degree of profitability that management desired.

12. In its fiscal year ended September 30, 1966 Old RSD's profitability experienced a drastic decline. In fact, it recorded a net operating loss for the year of almost $1,500,000. The minutes of a Special Meeting of Old RSD's Board, held on September 6, 1966, described the situation as follows:

R. Stuart Dickson reported that financial conditions generally, including those of the Company, had deteriorated since the last meeting and a financial statement showing the operations of the Company for the 10-month period ended July 31, 1966, was furnished each Director. Mr. Dickson further stated that although the losses sustained by the Company could be attributed to diminishing values in corporate and municipal securities, any expectation of achieving a profitable operation was severely limited by the Company's inability to obtain a membership on the New York Stock Exchange and by the general decline in investment interest in over-the-counter securities.

After the above recapitulation of the current state of affairs and future prospects for Old RSD, Stuart Dickson informed the directors that he had been contacted by a senior officer of Dominick & Dominick, an old, established member of the NYSE, who had proposed a merger with that portion of Old RSD relating to its brokerage operations. On motion duly made, seconded and unanimously carried, the Board authorized Old RSD's management to continue exploratory talks with Dominick & Dominick.

13. On October 4, 1966 Stuart Dickson issued a written statement to the shareholders of Old RSD advising them that an agreement had been concluded with Dominick & Dominick. The action taken and the

future business of Old RSD were described as follows:

The purpose of this letter is to inform you about certain recent transactions which for obvious reasons could not be described fully until agreement had been reached concerning them. We refer, of course, to the transfer of your Company's retail distribution facilities to the old, established New York Stock Exchange member firm of Dominick & Dominick, Incorporated which was announced in the press several days ago.

Also, we want to confirm to you that R.S. Dickson and Company not only will continue its other investment banking functions, but also that it will be able to devote its full resources to this purpose. The Company offers capital programs for businesses involving either a public or private sale of securities, undertakes financial advisory studies, makes research and valuation reports for merger or acquisition purposes, provides venture capital, and manages its own portfolio of capital investments as well as those of special clients.

\* \* \* \* \* \*

The Company's operations in the several fields in which it will continue have been and are expected to remain profitable. It is anticipated that the Company will maintain its registration with the Securities and Exchange Commission and will retain its membership in the National Association of Securities Dealers, the Investment Bankers Association of America and certain other organizations related to investment banking. The management of the Company believes that its personnel are well qualified to perform successfully in all the investment banking operations in which the Company will continue.

Notably, the Midwest Stock Exchange was not included among the organizations in which Old RSD announced that it planned to maintain membership for purposes of its future business.

At trial Stuart Dickson explained that Dominick & Dominick assumed Old RSD's leasehold obligations at the remaining 12 retail distribution facilities that the latter maintained outside of Charlotte, and purchased the furnishings that were in those offices. In addition, the purchaser took over many of the employees who had manned those offices for Old RSD. As an inducement for Dominick & Dominick assuming those obligations and responsibilities, Old RSD permitted it to take over its municipal bond underwriting business together with the skilled personnel who operated that profitable segment of Old RSD's activities.

14. The tension between the Dickson interests and the dissident minority that had frustrated Old RSD's effort to restructure itself to qualify for NYSE membership (Finding 11, *supra*) persisted. The quarrel centered on a difference of opinion between the two factions over the true value of Old RSD's shares, with the dissidents contending for a higher value than that acknowledged by the Dickson interests. The issue came to a head at the annual meeting of Old RSD stockholders on November 21, 1967. By a resolution adopted at that meeting the dissidents signified their desire to withdraw from the company and submitted proposals for surrender of their shares at various stated values.

At a special meeting of Old RSD's Board on February 5, 1968 it was resolved to purchase all of the Company's shares that had been tendered at a price of not more than $40 per share, cash, or $42 per share, payable in three installments over an 18-month period with interest at 6 percent. On these terms Old RSD was able to acquire approximately 9,500 of its outstanding shares but in doing so it failed to attract any significant portion of the shares held by dissidents. As Alan Dickson testified, the shares surrendered were held principally by interests friendly to the Dicksons.

At the same special meeting the Board authorized an information release to all Old RSD shareholders stating in part as follows:

The Managements of R.S. Dickson and Company and American & Efird Mills, Inc. are studying the possibilities of continuing the interests of the two compa-

nies for the purpose of obtaining both diversification and greater marketability for their shareholders.

\* \* \* \* \* \*

You will be informed further as developments occur in this matter.

The stated objectives of greater marketability for equity interests and diversification were explained by Alan Dickson. The reference to marketability related to the shares of Old RSD. Those shares were not actively traded on any public exchange and their value had, as earlier explained, long been the subject of substantial and bitter disagreement between minority interests and Old RSD's management. Diversification was the primary interest of A & E which had been buffeted by the severe import competition that afflicted domestic textile manufacturers generally.

15. Stuart Dickson testified that informal discussions concerning the merger of Old RSD and A & E had begun between himself and his brother, Alan Dickson, in 1967. The record reflects that the initial plan of consolidation was one that contemplated the merger of Old RSD into A & E to be followed by a name change of the surviving entity to the Ruddick Corporation. Both Dicksons testified, however, that the plan was frustrated by the opposition of the Equitable Life Assurance Society, a secured creditor of A & E that insisted on that company's assets remaining in its own name as borrower. To meet that requirement the plan of reorganization was altered to provide for the creation of a holding company that would issue its shares in exchange for all of the shares of Old RSD and A & E, with the latter entities continuing as wholly owned subsidiaries of the new company. With that plan in mind the parties commissioned their respective public accounting firms and outside counsel to prepare for its implementation. It appears that Old RSD's legal and accounting representatives took the lead. The public accounting firm of Haskins & Sells had long been Old RSD's auditor and tax advisor and the Charlotte firm of Helms, Mulliss, McMillan & Johnston its legal counsel.

16. On June 4, 1968 various members of Old RSD's management, including its comptroller and in-house tax specialist, Mr. J.L. Overton, met with representatives of Haskins & Sells' Charlotte office and a member of the Helms law firm to fix time objectives for the preparation of such financial statements as would be needed for purposes of the necessary proxy statement and for the submission to the Internal Revenue Service of an application for a ruling on the tax consequences of the proposed reorganization. Among the tax questions posed within the group as requiring further consideration and resolution was the matter of whether the constituent members of the corporate entities comprising the holding company group should file separate returns, as A & E had been doing on behalf of itself and eight wholly owned subsidiaries for surtax exemption reasons, or a consolidated return, as Old RSD had been doing with its subsidiaries, including Ruddco. In that connection it was noted that one disadvantage of the separate return approach, thought to more than offset savings in surtax, was the restriction of flexibility in utilization of existing net operating loss carry-forwards in Old RSD and certain of its subsidiaries.

17. Mr. Overton was designated by Old RSD's management to be that firm's contact with Haskins & Sells for purposes of supplying information concerning the reorganization to the tax specialists in the accounting firm and securing tax advice from them. Mr. Overton was thoroughly competent in that role. Mr. Overton's regular contact in Haskins & Sells for purposes of consultation on the tax aspects of the reorganization transaction was Mr. Herbert W. Wakeford, a senior accountant assigned to the tax department of Haskins & Sells' Charlotte office.

18. By a letter of July 9, 1968 to the Commissioner of Internal Revenue Old RSD's counsel requested a ruling that the proposed transaction qualifies as a reorganization under Section 368(a)(1) of the Internal Revenue Code with no gain or loss recognized to (1) the new corporation (2) A & E (3) Old RSD, or (4) the shareholders of

the latter two entities (specifically including that portion of new company shares to be received by Old RSD stockholders as a pass-through of unrealized appreciation of the 100,004 shares of A & E owned by Old RSD), with no step-up in basis to any of the parties involved and a carryover of existing balances of earnings and profits. The requested ruling was issued on October 25, 1968.

19. By a letter dated August 14, 1968 Haskins & Sells transmitted to Mr. J.L. Overton of Old RSD a memorandum concerning the tax matters that had been under discussion by representatives of Old RSD and Haskins & Sells in recent weeks. The letter stated in part:

It is not possible to make recommendations with positive assurance of consequences on all points, either because a given decision has not yet been reached or because the applicable tax law is subject to various interpretations. However, the memo does present our analysis and suggestions as to the tax aspects of the merger plan now under consideration.

One additional point might be made with respect to the attempted optimum *utilization of the "old" RSD's net operating loss carryovers. If the loss is disallowed in "new" Ruddick, but the new RSD has hedged this possibility as suggested,* then the loss will still be *absorbed at capital gain rate,* which is *no worse a result than would be expected if the merger does not take place.* In other words, the circumstances of this merger may, in effect, create an extra tax benefit to the new group which the old RSD group would probably never have enjoyed on its own, but little or nothing is to be lost. (Emphasis added.)

The underlying Memorandum, prepared by Mr. Wakeford of Haskins & Sells, included the following observations and suggestions concerning Old RSD's net operating loss situation:

The purpose of this memorandum is to summarize the results of our research to date and to set forth some tentative conclusions with respect to certain aspects of the Company's proposed merger with American and Efird Mills, Inc. There have been several meetings in recent weeks where these matters were discussed, attended variously by Messrs. R.S. Dickson, J.L. Overton, J.A. McMillan and W.B. Phillips of the client company. Mr. J.W. Johnston of Helms, Mulliss and Johnston and Messrs. J.O. Funderburk, W. Craemer, Jr., F.O. Daniels, C.W. Davidson, and myself of H & S. We have also consulted with Mr. Jack Macy of our Chicago office and Mr. Hugh Eggan of our Washington office, who have extended and confirmed our research on certain key points.

\* \* \* \* \* \*

It was originally intended that the new Ruddick would be merely a holding company, with the old RSD assets and the old A & E assets being redistributed to two new subsidiaries of the same names. However, *it now appears that the A & E assets must be kept in the new Ruddick to absorb the old RSD net operating loss carryovers most effectively,* and at least part of the old RSD assets must also be retained there *in order that the new Ruddick may hold onto these losses.*

It appears from the special audit work for the period through June 30 and the Company's forecast for the remainder of this year that the present net operating loss carryovers of BSR and Senate Plaza, plus part of those attributable to RSD, will be absorbed in the RSD group consolidated return for the year ending September 30, 1968. *The remaining consolidated net operating loss carryover* (approximately *1,000,000) will be attributable almost entirely to the old RSD parent company,* and will date from the year ended September 30, 1966.

\* \* \* \* \* \*

The remaining loss carryovers of RSD (or those of BSR and Senate Plaza, if any) will *not* be available to offset income of the new consolidated group as such, since these losses are considered to have arisen in a "separate return limitation year," as defined in Reg. 1.1502–1(e),

1.1502–79(a), etc., and because there has been a "consolidated return change of ownership." However, the old RSD parent company losses will be usable by the new Ruddick under the principles of Sec. 381. (The Sec. 382 limitations will not apply because the old RSD stockholders will have more than 20% of the new Ruddick and there will be no change in the nature of the business operations.) *In order for the new Ruddick to utilize these loss carryovers, the A & E parent operations should be retained in the new Ruddick,* otherwise, it would be generating no income of its own (except intercompany dividends, which are eliminated in consolidation) and so the loss could not be absorbed.

Also, *if all of the old RSD assets are redistributed to a new RSD, the loss carryover would follow the assets,* under the Reg. 1.381(a)–1(b)(2) definition of "acquiring corporation." *This result is not the most desirable, since RSD is likely to have only capital gain income in future years to absorb the losses. Offsetting these losses against ordinary income would produce a greater tax benefit.*

For NASD and other broker-dealer operating and regulatory purposes, *it is considered essential that a new RSD be established as a separate corporation* and that it have a certain minimum of assets, say $3,000,000. Therefore *the primary problem at this point is to determine how to transfer sufficient assets of the old RSD to a new RSD without taking along the net operating loss carryovers.*

\*     \*     \*     \*     \*     \*

*As a hedge against possible disallowance of the loss carryover in the new Ruddick,* it appears desirable that the new RSD plan to sell one of the securities (for example, Palmetto State Life) in which there is sufficient unrealized appreciation to establish at least a capital gain with which to absorb the loss carryovers before they expire. *This point should be noted for follow up after the merger.* The actual *amount* of gain to be realized for purposes of loss carryover absorption should be considered more closely at that time in view of the recent RAR issued on the old RSD group. The adjustments proposed have not been fully argued or settled upon as yet, but any which are finally accepted will tend to decrease the actual loss carryover deduction available. The *timing* of the gain realization should take into account the tax surcharge period as well as the carryover expiration period.

Another possibly desirable outcome of the reorganization would be for the *new RSD to end up holding the American Credit Corporation stock presently owned by old Ruddick. This stock is the only marketable security old Ruddick holds, it reflects a large built-in gain (about $1,000,000) which might also be used as suggested above to hedge an adverse decision on the loss carryovers,* and it would appear most appropriate as an asset of the new RSD for operating and collateral purposes. *This result could be accomplished by having Ruddick pay a dividend to old RSD, before the merger, in the form of the American Credit stock.* This dividend would be eliminated in the Federal consolidated return, and the state tax effect would be negligible, since Ruddick is a 91% North Carolina corporation. Under the provisions of Sec. 301, the dollar value of this intercorporate dividend-in-kind would be about $200,000, old Ruddick's cost basis, not the present fair market value. (Emphasis added.)

20. On October 25, 1968 the Board of Directors of Ruddco declared a dividend in kind consisting of 52,638 shares of common stock of American Credit Corporation (ACC). Mr. Overton testified at trial that the original idea of declaring this dividend was his alone. Ruddco had a cost basis in the ACC stock of $194,102 and on June 30, 1968 the market value of the same shares was $1,263,312. On the same date the market value of the 110,004 A & E shares owned by Old RSD was $1,705,062.

21. Mr. Herbert Wakeford of Haskins & Sells authored a memorandum, dated October 25, 1968, supplementing his memoran-

dum of the previous August, stating in part:

> Due to limitations imposed on A & E by its loan agreements with Equitable Life, the merging companies have reverted to the plan of reorganization wherein new Ruddick will, immediately following the statutory consolidation, transfer all of the assets of old RSD to new RSD and all of the assets of old A & E to new A & E. (The effective result is that the two former corporate structures will be unchanged, with new Ruddick added as a "superparent" holding company.)
>
> One consequence of this decision is that the net operating loss carryovers of old RSD will flow through to new RSD, which is the "acquiring corporation" under regulations 1.318(a)–1(b)(2) as discussed earlier. Since this carryover must be absorbed by new RSD alone, not the new consolidated group, old Ruddick has recently paid a dividend to old RSD in the form of the low-basis American Credit Corporation stock, thus setting up the hedge situation recommended.
>
> Both RSD and A & E held stockholders' meetings on October 21, 1968, where the merger was approved, subject to a favorable ruling from the IRS, to be effective October 28. The requested ruling was issued on October 25, 1968; a copy of it has been placed in the Tax Section rulings file. (Emphasis added.)

22. On October 28, 1968 the planned reorganization was accomplished by the creation of plaintiff, to which all assets of A & E and of Old RSD, except for the 110,004 A & E shares owned by that company, were transferred in exchange for plaintiff's stock. Plaintiff thereupon created a new A & E, to which it transferred all former A & E assets in exchange for all of the new A & E's stock, and did the same with respect to RSD so that the end result was that former A & E and Old RSD shareholders received all of plaintiff's outstanding stock and the businesses of A & E and Old RSD became plaintiff's wholly owned subsidiaries. The Old RSD shareholders received plaintiff's stock in two increments; first, they received new company shares representing the value of Old RSD exclusive of the 110,-004 A & E shares held by it. In addition, they received new company shares separately compensating them, by way of pass-through, for the market value of those A & E shares immediately prior to the reorganization. Neither Old RSD nor its successor entity, RSD, were in any way compensated for the value surrendered by the former represented by the market value of the 110,004 A & E shares owned by Old RSD. Had RSD, rather than the shareholders of Old RSD, received the shares of plaintiff's stock issued in exchange for the market value of the 110,004 A & E shares (i.e., approximately $1,700,000) the net capital of RSD would not have been impaired and the successor RSD would have remained in the same qualified good standing with NASD, the SEC and the MSE as its predecessor, Old RSD. This continuing qualification follows from the value equivalence of the two types of shares and from the fact that plaintiff's shares were traded over-the-counter, just as A & E's shares theretofore had been. Furthermore, there was no question as to the market viability of plaintiff's stock. Alan Dickson testified that from the outset the market for plaintiff's shares was such that the former dissident shareholders of Old RSD were able to sell the shares that they received in the reorganization at prices that returned them three to four times the obtainable value of the Old RSD shares surrendered by them.

23. Following the reorganization Stuart Dickson became plaintiff's chairman and Alan Dickson its president. Alan became concerned about the overall debt level of the enterprise group. Realizing that the American Credit Corporation (ACC) holding was the only stock in RSD's portfolio that was listed on the New York Stock Exchange and therefore potentially at least, readily marketable, he proposed that the stock be sold and the proceeds applied to debt curtailment. Stuart had long been a director of ACC and believed that the company had yet to reach its full value potential. He was therefore opposed to such a sale. Alan persisted and, on or about De-

cember 17, 1968, Stuart agreed to attempt a sale of the stock. Accordingly, by a letter of that date, he advised ACC that he would not stand for reelection to its Board.

24. In an effort to test the market for ACC stock, RSD sold 1,500 ACC shares at a price ranging from 27¾ to 27⅞. On January 9, 1969 it sold 1,600 ACC shares at prices ranging from 25 to 25½ and on January 14, 1969 it sold another 1,900 shares at 25.

25. In January 1969 Alan Dickson met a Mr. Longiotti who was representing the seller of a business that plaintiff was considering for acquisition. In the course of that meeting Alan Dickson showed Longiotti a copy of plaintiff's financial statements. Noting the large block of ACC stock appearing on RSD's balance sheet, Longiotti asked whether the stock was for sale, explaining that he thought he knew of a principal who might be interested in purchasing it. Alan Dickson replied that the stock was available. They parted with the understanding that Longiotti would get in touch if genuine buyer interest materialized. Such was the case and on January 21, 1969 RSD sold its remaining 50,000 shares of ACC stock at 25⅞ to Mr. Longiotti's prospect. All proceeds of these sales were applied to curtailment of RSD debt and Longiotti was paid a $6,250 finder's fee by RSD.

26. In a March 31, 1969 interim report to shareholders plaintiff advised, *inter alia,* that RSD was involved in extensive underwriting activities and that plaintiff had realized a $524,011 tax benefit from utilization of loss carryovers. The benefit described, which amounted to 19 cents per share, referred to the offset of Old RSD's 1966 net operating loss against the long-term capital realized on RSD's sale of the ACC stock.

In the course of pretrial proceedings in this cause, plaintiff admitted that without the capital gain realized from sale of the ACC stock RSD would have incurred net losses for federal tax purposes in both its 1969 and 1970 fiscal years. In his testimony at trial Mr. Overton reaffirmed that admis-sion. In any event, plaintiff offered no evidence at trial to prove that aside from the ACC capital gain RSD had sufficient net income, per its returns, to enable it to utilize Old RSD's net operating loss carry-over in either its 1969 or 1970 fiscal years.

27. Effective March 31, 1969 Ruddco distributed notes and securities with a total value of $1,772,707.51, and a note payable to RSD in the face amount of $1,174,000, to RSD as a dividend. Effective the same date, RSD declared a dividend to plaintiff consisting of securities and its $1,174,000 note receivable from Ruddco together with notes payable totalling $1,755,828.02. The effect of these dividend actions was to drastically reduce Ruddco's and RSD's venture capital investment portfolios, with RSD only retaining sufficient assets to conduct its investment banking function. The evidence shows that from November 1968 forward RSD trading activity on the MSE was for the most part nonexistent and otherwise negligible.

28. In 1969 RSD was approached by the J.H. Crawford & Co. securities firm of Columbia, South Carolina, on the question of merger of the two firms. The Crawford firm suffered from the same lack of NYSE membership that RSD did and had the additional problem of inadequate capital. RSD was therefore not interested in participating in such a merger. When word of these discussions spread in the trade the NYSE firm of Powell, Kistler, based in North Carolina and also suffering from a problem of inadequate capital, approached RSD with the idea of merger or some other form of business association in mind. The result of these contacts was formation of a partnership on February 2, 1970 between the Crawford and Powell, Kistler firms. RSD elected not to join the partnership. Instead it authorized the partnership the use of its name and loaned it $500,000 at the prime rate, secured by a subordinated note. Accordingly, the partnership operated under the name of R.S. Dickson, Powell, Kistler & Crawford. After this arrangement was concluded RSD substantially curtailed its investment banking activities, sold its mem-

bership in the Midwest Stock Exchange, dropped its membership in NASD and became thereafter known as the Ruddick Investment Company.